**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| IN RE: | Case No. 16-20516-AJC |
| | Chapter 7 |
| PROVIDENCE FINANCIAL INVESTMENTS, INC. | (Jointly Administered) |
| PROVIDENCE FIXED INCOME FUND, LLC, | Case No. 16-20517-AJC |
| Debtors. | |

/

| | |
|---|---|
| MARIA YIP, as Trustee of Providence Financial Investments, Inc. and Providence Fixed Income Fund, LLC, | Adv. Pro. No. |
| Plaintiff, | |
| v. | |
| SANJIV MATTA, | |
| Defendant. | |

/

**ADVERSARY COMPLAINT FOR BREACH**
**OF FIDUCIARY DUTY AND OTHER RELIEF**

Maria Yip, the Chapter 7 Trustee for the bankruptcy estate of Providence Financial

Investments, Inc. ("Providence Financial") and Providence Fixed Income Fund, LLC ("Providence

Fund"), files this Adversary Complaint against Sanjiv Matta ("Matta") and alleges:

**JURISDICTION AND VENUE**

1.      This is a non-core proceeding related to these bankruptcy cases pursuant to 28

U.S.C. §157 (c) and an adversary proceeding pursuant to Fed. R. Bankr. P. 7001 *et seq*.

2.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §157(a), 28

U.S.C. §157(c), and 28 U.S.C. § 1334.

3.      Venue is proper pursuant to 28 U.S.C. §1409 and other applicable law.

## PARTIES

4.      On July 28, 2016, Providence Financial filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code").

5.      On July 28, 2016, Providence Fund filed a voluntary petition for relief under Chapter 7 of Title 11 of the Bankruptcy Code.

6.      Maria Yip is the duly appointed Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of Providence Financial and Providence Fund (jointly, the "Debtors").

7.      Upon information and belief, Matta is an individual residing in Seminole County, Florida.

## FACTUAL ALLEGATIONS

**A.      The Bankruptcy Cases**

8.      On July 28, 2016, the Trustee was appointed as the Chapter 7 Trustee over the Debtors.

9.      The Debtors are being jointly administered.

10.      Following her appointment and review of the Debtors' petitions, the Trustee obtained electronic accounting files, including balance sheets, income statements, general ledger reports, accounts payable reports and accounts receivable reports, records reflecting intercompany transfers between and among the Debtors and certain affiliates, and a report of amounts invested by each of the investors, including names, addresses, dates of original investment, and promised rates of returns.

11.      The Trustee continues to obtain information through third-party subpoenas.

12.    The Trustee's Accountants have reviewed and analyzed the Debtors' books and records.

**B.    The Debtors and Their Affiliates**

13.    The Debtors and certain of the Debtors' affiliates maintained a public website (www.provfinance.com) where the Debtors and their affiliates were described therein as the "Providence Companies" and collectively held themselves out as a diversified global commercial group of companies with over 30 years of experience in financial services, receivables financing, and trade in Brazil and other global emerging markets.

14.    According to the website, Antonio Buzaneli ("Buzaneli") was the CEO and co-founder of the "Providence Companies" and the director of both Providence Investment Management International Limited and Providence Investment Funds PCC Limited.

15.    The principal place of business of Providence Financial and Providence Fund was located in Miami-Dade County, Florida at all relevant times.

16.    While Providence Financial, Providence Fund, and their affiliates purported to conduct business throughout the world, they listed their "Global Headquarters" as being in Key Biscayne, Florida.

**C.    The Investments Marketed and Sold by Providence**

17.    Providence Financial and Providence Fund, by themselves and through their affiliated companies (collectively, "Providence"), were in the business of the unregistered sale of securities in the form of promissory notes which typically promised to pay annual returns of approximately 12% or 13% (and sometimes higher) based on "factoring" alleged accounts receivable in Brazilian companies.

18.     Providence offered and sold the promissory notes to investors throughout the United States, including in Florida.

19.     At all relevant times, Buzaneli, and other insiders and co-conspirators used the business of the Debtors as part of a classic Ponzi scheme.

20.     In order to market and sell the promissory note investments Providence recruited what Providence referred to as its "originators."

21.     The originators were promised commissions, which were denominated "referral fees," for successfully introducing potential investors who ended up issuing funds to Providence to invest in a "commercial loan" (*i.e.*, the promissory notes).

22.     Providence promised the originators the payment of such commissions only if each potential investor was "directly" introduced by the originator.

23.     The vast majority, if not all, of the originators were not registered representatives of any broker or dealer registered with the United States Securities and Exchange Commission (the "SEC").

24.     The SEC has determined that the promissory notes that Providence provided to investors, and which were procured through the efforts of the originators, were "securities" within the meaning of the federal securities laws and that no registration statement for the notes has been filed with the SEC.

25.     Providence and its originators provided prospective investors with written materials (as to which Matta participated in preparing) purporting that the investment in the promissory notes was a safe and low risk investment.

26.     For example, in an "Executive Memorandum," which claimed to be "a formal presentation of the Providence Fixed Income Fund ('the Fund') to assist investors in the evaluation

4

of personal financial decisions," Providence outlined investments in "short-term notes" where Providence "has been able to develop a smart high yield investment instrument where the amount of risk in the investment is proportionally less that [sic] the favorable high ROI [return on investment] actually experienced" and that a 12% return is a high return but the investment was "considered low to moderate risk"; in fact, contrary to these representations, the proposed investments were high risk, and legitimate high returns were not, and were not going to be, "actually experienced."

27.     The Executive Memorandum also represented that "[t]he proceeds of the Note shall be used for the *sole purpose* of providing working capital in the form of an intercompany loan to the Issuer's Brazilian Subsidiaries or its affiliates which will use the proceeds of the loan to acquire receivables or financial instruments" (emphasis added); unbeknownst to the investors, at the time of that statement and thereafter, Providence was not using the proceeds of the notes for the "sole purpose" of providing working capital but rather the proceeds were diverted to other uses.

28.     As part of its suggesting that the investment was safe, the Executive Memorandum described factoring as a financial transaction whereby a business sells its accounts receivable to a third party (the factor) at a discount, and the factor obtains the rights associated with the receivables.

29.     Another memorandum (titled "PROVIDENCE FINANCIAL FIXED INVESTMENTS INC. HIGH YIELD FIXED RETURNS") (the "Information Memorandum"), which was provided to prospective investors, touted the profitability of receivables factoring in Brazil and, in a section titled "Objectives," it stated that Providence's "portfolio strategy is to generate attractive, uncorrelated, fixed absolute returns from participating in the receivable financing of small and medium sized businesses (SME) in Brazil."

30.    The Information Memorandum also stated, in a section called "Growth Unlimited," that one of Providence's "main philosophies" is to "[p]rovide investment safety with real high yield returns."

31.    The Executive Memorandum, the Information Memorandum, and similar documents were used by Providence to market the product to potential investors.

32.    As of December 2015, the Debtors had amassed over 800 promissory notes, pledging re-payment to more than 400 investors located in the United States who collectively invested at least $64 million.

33.    The outstanding Providence notes sold are essentially worthless in light of the financial condition of the Debtors.

34.    It was not until after the SEC commenced proceedings in June 2016, the Debtors' bankruptcy filing in July 2016, and the Trustee's subsequent investigation that the improper conduct of Matta, Buzaneli, and others was revealed.

35.    After being indicted on thirteen counts of criminal misconduct stemming from the Ponzi scheme, Buzaneli and others entered into plea agreements with the U.S. Attorney's Office for the District of Minnesota, pleading guilty to conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349 and admitting to defrauding investors and running a Ponzi scheme from the Providence entities' offices.

36.    As part of his Plea Agreement, Buzaneli admitted, among other things, (a) that he made, and caused others to make, verbal misrepresentations to investors and potential investors regarding Providence's use of investors' funds, including falsely representing that the investors' funds would be invested in factoring in Brazil, (b) that he directed that investor funds be used to make "Ponzi-style" payments, (c) that he directed that investor funds be used to pay his travel

6

expenses, and (d) that he directed that investor funds be used to transfer money to corporate entities controlled by Buzaneli, including as to corporate entities that were completely unrelated to the business of the Providence entities.

**D.      Matta's Involvement**

37.      Matta, as a principal of Providence Financial and Providence Fund, played a significant role in overseeing the operation of the Debtors at all relevant times.

38.      Matta was identified in the Executive Memorandum as a "Director" of Providence.

39.      Matta participated in the drafting of Providence memoranda and other materials disseminated to investors and originators.

40.      Matta knew, at the time when the statements were made in memoranda and other marketing materials, that the statements about the investments being safe and low risk were not true.

41.      Matta participated in overseeing and directing the marketing strategy of Providence. Generally, the marketing strategy devised by Matta and others was to target unsophisticated investors who, in their estimation, were unlikely to be in a position, or have the expertise, to question the misleading representations being made by persons marketing Providence investments and its originators.

42.      Matta concealed his wrongful activities and the activities of others (including Buzaneli) from third parties, including investors and regulatory authorities.

43.      Matta played a key role in luring investors to Providence with the false promises of high return with low risk.

44.      Matta participated in the diversion of funds to Providence's principals and originators.

45.     At all relevant times, Providence's obligations to the investors greatly exceeded Providence's assets to repay investors, and thus the Debtors were insolvent at all relevant times.

46.     Matta engaged in the misconduct alleged herein for his own personal interests and, at all relevant times, acted adversely to the interests of the Debtors.

47.     As a result of Matta's misconduct and his assistance in the misconduct of others, the Debtors were subjected to, and continue to be subjected to, significant financial losses and liabilities.

48.     All conditions precedent to the filing of this action have been performed, have been waived, have been satisfied, or otherwise occurred.

## COUNT I
## BREACH OF FIDUCIARY DUTY

49.     The Trustee re-alleges and reincorporates paragraphs 1 through 48 of this Complaint as though fully set forth herein.

50.     At all relevant times, Matta was an officer or director of Providence Financial and Providence Fund and exercised influence over the operation of Providence Financial and Providence Fund and the sale of promissory notes to investors.

51.     As a result, Matta owed Providence Financial and Providence Fund and their creditors a fiduciary duty to discharge his duties in good faith, with care that an ordinarily prudent person in a like position would exercise and in a manner reasonably believed to be in the best interests of Providence Financial and Providence Fund.

52.     Based on the conduct alleged herein, Matta breached his fiduciary duties owed to the Debtors.

53.     Matta exhibited a conscious, grossly negligent and/or reckless disregard for the best interests of Providence Financial and Providence Fund and their creditors in relation to the facts and circumstances set forth above.

54.     Matta caused Providence Financial and Providence Fund to enter into transactions in order to advance his own interests to the detriment of Providence Financial and Providence Fund and their creditors.

55.     Matta knew or should have known of the risk of damage that his conduct ultimately caused Providence Financial and Providence Fund and their creditors.

56.     In addition to his intentional conduct, Matta was negligent, grossly negligent and/or acted with reckless disregard or in bad faith in the discharge of his duties.

57.      Matta's acts and omissions in breach of his fiduciary duties are a direct and proximate cause of damages suffered by Providence Financial and Providence Fund.

58.     As a direct and proximate result of Matta's acts and omissions in breach of his fiduciary duties, the Debtors have suffered damages of at least $49,511,186 arising from the entry of a Judgment by the United States District Court for the District of Minnesota in Case No. 0:16-cv-01877-SRN-SER, which disgorges and fixes that amount as a liability against Providence Financial and Providence Fund, jointly and severally.

**WHEREFORE,** the Trustee requests that this Court enter judgment against Matta (a) for actual, compensatory, consequential, incidental, special and exemplary/punitive damages in an amount to be proven at trial, but in no event less than $49,511,186, (b) costs and expenses as allowed by law, (c) pre- and post-judgment interest as allowed by law, and (d) any other legal or equitable relief the Court deems appropriate.

## COUNT II
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

59.     The Trustee re-alleges and reincorporates paragraphs 1 through 48 of this Complaint as though fully set forth herein.

60.     Based on the conduct alleged herein, Matta aided and abetted Buzaneli's breach of the fiduciary duties owed by Buzaneli to the Debtors.

61.     At all relevant times, Buzaneli was an officer of Providence Financial and Providence Fund.  As a result, Buzaneli owed Providence Financial and Providence Fund and their creditors a fiduciary duty to discharge his duties in good faith, with care that an ordinarily prudent person in a like position would exercise and in a manner reasonably believed to be in the best interests of Providence Financial and Providence Fund.

62.     Buzaneli exhibited a conscious, grossly negligent and/or reckless disregard for the best interests of Providence Financial and Providence Fund and their creditors in relation to the facts and circumstances set forth above.  Buzaneli knew or should have known of the risk of damage that his conduct ultimately caused Providence Financial and Providence Fund and their creditors.

63.     Buzaneli caused Providence Financial and Providence Fund to enter into transactions in order to advance his own interests to the detriment of Providence Financial and Providence Fund and their creditors. Buzaneli knew or should have known of the risk of damage that his conduct ultimately caused Providence Financial and Providence Fund and their creditors.

64.     As part of his own Plea Agreement, Buzaneli admitted, among other things, (a) that he made, and caused others to make, verbal misrepresentations to investors and potential investors regarding Providence's use of investors' funds, including falsely representing that the investors' funds would be invested in factoring in Brazil, (b) that he directed that investor funds be used to

10

make "Ponzi-style" payments, (c) that he directed that investor funds be used to pay his travel expenses, and (d) that he directed that investor funds be used to transfer money to corporate entities controlled by Buzaneli, including as to corporate entities that were completely unrelated to the business of the Providence entities; Matta was aware of, and substantially assisted, Buzaneli in such conduct.

65.     Matta was aware of Buzaneli's conduct which advanced Buzaneli's own personal interests to the detriment of Providence Financial and Providence Fund and their creditors.

66.     Matta had actual knowledge of and actively participated in, or provided substantial assistance in respect of, the actions and omissions by Buzaneli that constituted Buzaneli's breach of his fiduciary duties to the Debtors.

67.     As a direct and proximate result of Matta's acts and omissions, the Debtors have suffered damages of at least $49,511,186 arising from the entry of a Judgment by the United States District Court for the District of Minnesota in Case No. 0:16-cv-01877-SRN-SER, which disgorges and fixes that amount as a liability against Providence Financial and Providence Fund, jointly and severally.

**WHEREFORE,** the Trustee requests that this Court enter judgment against Matta (a) for actual, compensatory, consequential, incidental, special and exemplary/punitive damages in an amount to be proven at trial, but in no event less than $49,511,186, (b) costs and expenses as allowed by law, (c) pre- and post-judgment interest as allowed by law, and (d) any other legal or equitable relief the Court deems appropriate.

Dated: July 27, 2018                    **AKERMAN LLP**

Three Brickell City Centre
98 Southeast Seventh Street
11th Floor
Miami, Florida 33131
Phone: (305) 374-5600
Fax: (305) 374-5095

By: */s/ Bryan T. West*
Brian P. Miller
Florida Bar No.: 0980633
E-mail: Brian.Miller@akerman.com
Bryan T. West
Florida Bar No.: 83526
E-mail: Bryan.West@akerman.com
Luis R. Casas
Florida Bar No.: 0094222
E-mail: Luis.Casasmeyer@akerman.com

*Counsel for Trustee*